**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BARBARA A. AMODIO, | : | |
|     Plaintiff | : | |
| | : | |
|     v. | : | CIVIL ACTION NO. |
| | : | 3:05CV714  (JCH) |
| WILD OATS MARKETS, INC. | : | |
|     Defendant. | : | SEPTEMBER 28, 2006 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. No. 17]**

**I.      INTRODUCTION**

The plaintiff, Barbara A. Amodio, has asserted five claims against her former employer, Wild Oats Markets, Inc. ("Wild Oats"), the defendant. Count I alleges that Wild Oats retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*  Count II alleges discrimination on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA").  Count III alleges that Wild Oats terminated and otherwise retaliated against plaintiff for exercising her First Amendment rights protected under Conn. Gen. Stat.  § 31-51q.  Count IV alleges disability discrimination in violation of the Americans with Disabilities Act of 1991 ("ADA").  Count V asserts a claim of intentional infliction of emotional distress under Connecticut state law.

Wild Oats has moved for summary judgment on all five claims, asserting that there is no genuine issue of material fact concerning any of Amodio's claims.

1

II.   **STANDARD OF REVIEW**

In a motion for summary judgment, the burden lies on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Communications, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004).  The moving party may satisfy this burden "by showing – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted); accord Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . ." Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted).  A dispute regarding a material fact is genuine, "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992)).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich,

2

963 F.2d at 523 (internal citation omitted).  Thus, "'[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper.'" Id. (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991)); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992) ("Viewing the evidence in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is inappropriate.").  "'If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'"  Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)).

When a motion for summary judgment is supported by sworn affidavits or other documentary evidence permitted by Rule 56, the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading." Fed. R. Civ. P. 56(e); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment.  Id.  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted). Similarly, a party may not rely on conclusory statements or an

argument that the affidavits in support of the motion for summary judgment are not credible.  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

## III.    FACTUAL BACKGROUND[1]

In or around February 2001, Barbara Amodio was hired by Wild Oats to serve as a Mercantile Manager at the defendant's Westport, CT store.  See Def.'s Memorandum of Law in Support of its Motion for Summary Judgment ("Mem. in Supp.") at Ex. A-2, Amodio Dep. at 93 [Doc. No. 18].  At the time of her hire, Amodio was 53 years old, and suffered from a past injury that caused her to have a limp and required her to wear wrist cuffs.  Amodio informed the defendant of her physical disability prior to her employment.

In September 2001, Amodio was transferred to a marketing position, where her responsibilities included coordinating store promotional events, participating in community outreach, and being involved in overall store look, as well as facilitating contacts with local non-profits, scheduling in-store events, and serving as "point person" for the local store.  See  Plf.'s Loc.R.Civ.P. 56(a)2 Statement ("Plf.'s Stat.") at Ex. 3 [Doc. No. 21].  The position also involved some physical work, such as the arranging of displays at the end of each aisle and ensuring proper signage.[2]

In or around December 2001 and January 2002, Amodio spoke to the Store Manager, Scott Reed, regarding the behavior of Paul Pace, the Manager of Food

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support her allegations.

[2]The parties dispute the extent to which the handling of items for promotional events involved physical work.  See Plf.'s Stat. at Ex. 2, Amodio Dep. at 124.

Services.  Amodio had received complaints from other employees about Pace's inappropriate conduct, including sexually-inappropriate behavior.[3]  According to Amodio, management-level employees then began to treat her differently, suddenly criticizing her work and making age-related comments on several occasions.  See Plf.'s Response to Def.'s Motion for Summ. Judgment ("Plf.'s Response") at Ex. 2, Amodio Dep. at 126-30, 154-55, 287-88 [Doc. No. 22].

On May 14, 2002, Scott Reed was replaced by Jim Batema as Store Manager, who changed Amodio's position to Natural Living Clerk in September 2002.  The new position, which Amodio characterizes as a "demotion," see id. at Ex. 7, Amodio Aff. ¶ 8, included such duties as unloading products from shipping crates and rearranging products, thus involving more lifting, bending and straining.  In late January 2003, Amodio had to leave work due to neck pains, and she returned to work on February 1, 2003, with a doctor's note diagnosing her with "acute neck and shoulder pain" and prohibiting her from doing heavy lifting, bending or pushing for a week.  On February 3, 2003, Amodio underwent eye surgery because of a tear of her retina, and on that same day, New England Retina Associates called and faxed Wild Oats a note explaining Amodio's eye condition and that she could return to work on February 12, 2003, but with the restriction of no lifting, bending or straining.  Due to another tear in her retina, New England Retina Associates prepared three more of such notes, on February 5, 14, and 28, each indicating that plaintiff could return to work on February 15, March 1, and March 9, respectively.  Each note advised Wild Oats that Amodio would not be able to

---

[3]While Amodio agrees that her complaints were not "formal," the substance of her complaints is a matter of dispute between the parties, which the court will address below.

do any lifting, bending or straining.

The parties agree that Amodio's surgery affected her ability to engage in life activities the night after the surgery, while within a week Amodio was able to teach classes at Fairfield University, where she was a part-time visiting professor. The surgery did not affect Amodio's ability to care for herself, and although she had to be careful in the two weeks following the surgery, she was able to walk, see, and read.

On February 8, 2003, Amodio filed a workers' compensation claim both for her eye as well as for her neck and shoulder pain. Ten days later, on February 18, 2003, she informed Wild Oats that she wished to take a leave of absence from February 18, 2003 until March 1, 2003, which was approved on or around February 19, 2003.[4]

On or around March 7, 2003, Amodio spoke by telephone with Batema about her employment status. Approximately a week later, on March 15, 2003, Amodio filed for unemployment compensation. As a result, Batema sent her a letter on March 24, 2003, stating that she was still in "active" status, and requesting that she fill out some FMLA leave papers and have her physicians send a note indicating that she is able to return to work without any restrictions.[5] On May 6, 2003, New England Retina Associates sent Wild Oats another note allowing Amodio to return to work but with the

---

[4]According to Amodio, Wild Oats' FMLA form contained multiple errors and miscalculated dates, and was signed on February 18, 2003. Additionally, plaintiff states that she was given the wrong disability forms. See Plf.'s Stat. at Ex. G-K. However, such disputed facts are not material to a ruling on the instant motion.

[5]The parties dispute the motivation behind this letter. According to Amodio, Wild Oats attempted to deny her unemployment and disability insurance. See Plf.'s Stat. at ¶ 27. The parties agree that Amodio received disability benefits for at least one year.

restrictions of no lifting, bending or straining until July 25, 2003.[6]  According to Wild

Oats, its leave policy at the time Amodio first went on leave allowed employees who

were not eligible for FMLA, but were unable to perform the "essential job functions" due

to illness, accident, pregnancy, or other medical problems, a medical leave of absence

of not more than 90 days.  See Def.'s Loc.R.Civ.P. 56(a)1 Statement ("Def.'s Stat.") at

Ex. B-3 [Doc. No. 19].  This policy was revised in June 2003 to allow these employees

to take a leave of absence of not more than 26 weeks.  See id. at Ex. B-4.  The policy

also stated that "failure to return to active employment at the end of an FMLA Leave

period will generally result in loss of the staff member's prior position with the

Company."  See id.  Amodio claims that she was not aware of Wild Oats' leave policy

as it related to her.  See Plf.'s Stat. at Ex. 7, Amodio Aff. ¶ 13.

The parties do not dispute that Amodio was terminated on October 1, 2003, as a

result of her not returning to work following the expiration of leave.  On the date of her

termination, Amodio had been on leave for 32 weeks, excluding her absence between

February 3, 2003, and the beginning of her medical leave of absence on February 18,

2003.

Both parties also agree that, although the incidents Amodio complains of began

in December 2001, she did not consult Suzanne Perlman, a Licensed Clinical Social

Worker, about work-related stress until January 2003.  Perlman treated Amodio until

December 2004, and stated that during the period of her treatment Amodio was able to

---

[6]Amodio asserts that she was hired with the understanding that she would not have to
do manual labor.  See Plf.'s Stat. at Ex. 7, Amodio Aff. ¶ 10.

take care of herself and engage in social functions and hobbies.  Perlman also did not refer Amodio for further treatment because she "didn't need a higher level of care."  <u>See</u> Def.'s Stat. at ¶ 36, Dep. Perlman at 49.

## IV.   DISCUSSION

### A.   Retaliation (Count I)

Amodio claims that Wild Oats retaliated against her as a result of her complaints to management about the sexually-harassing conduct of the Food Services Manager, Paul Pace, toward other employees.  <u>See</u> Plf.'s Response at Ex. 2, Amodio Dep. at 165.  Amodio's retaliation claim under Title VII is examined by applying the same <u>McDonnell Douglas</u> burden-shifting analysis used for discrimination claims.  <u>See</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 141 (2d Cir. 2003). In order for Amodio to make her *prima facie* case for retaliation, she must show:  "(1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." <u>Galdieri-Ambrosini v. Nat'l Realty and Dev. Corp.</u>, 136 F.3d 276, 292 (2d Cir. 1998). Wild Oats challenges Amodio's ability to establish the first and fourth prongs of the *prima facie* case.  The court will also address the second prong together with the fourth prong, in light of what the parties discussed at oral argument.

#### 1.   Protected Activity

With respect to the first prong of the *prima facie* case, the "protected activity" requirement, the question turns on whether the employee has protested an "unlawful

employment practice" under Title VII. See Wimmer v. Suffolk County Police Dep't., 176
F.3d 125, 135 (2d Cir. 1999), cert. denied, 528 U.S. 964 (1999).  Amodio "need not
establish that the conduct she opposed was actually a violation of Title VII, but only that
she possessed a 'good faith, reasonable belief that the underlying employment practice
was unlawful' under that statute."  Galdieri-Ambrosini at 292 (citations omitted).  While
informal protests of discrimination may constitute protected activity, see Sumner v.
United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990), "'careless and
uncounseled accusations of discrimination' are not necessarily protected."  Lapsley v.
Columbia University-College of Physicians and Surgeons, 999 F. Supp. 506, 524
(S.D.N.Y. 1998) (quoting Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995).
In Lapsley, the court held that the plaintiff's single "passing remark" to her supervisor
that she was being "treated differently as opposed to other whites and Hispanic
employees" was not to be construed as protected activity.  Id.

       In this case, however, Amodio complained more than once to Reed regarding
Pace's inappropriate behavior.  Amodio claims to have witnessed sexual harassment by
Pace (she saw him "putting his pen in his pants and doing other things," Plf.'s
Response at Ex. 2, Amodio Dep. at 220), and she also heard of his behavior from other
employees who would tell her Pace would tie their requests for a raise with sexual
comments ("if you want more than that, you are going to have to do me and Scott," id.
at Ex. 2, Amodio Dep. at 225).  In December 2001, Amodio complained to Scott Reed
that Pace was "out of control," Id. at Ex. 2, Amodio Dep. at 222, and in January 2002
she had additional discussions with Reed in which she indicated that she had told other
employees who were allegedly harassed by Pace to talk to Reed about it.

9

Wild Oats argues that Amodio's informal conversations with Reed should not be construed as "protected activity," as Amodio does not characterize them as formal complaints but only as a "quiet heads-up." See id. at Ex. 2, Amodio Dep. at 224. However, informal protests, such as complaining to management, may constitute protected activity. See Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). Wild Oats then argues that Amodio's statements were too vague to amount to "protected activity," citing the holding in Barber v. CSX Distribution Servs., 68 F. 3d 694 (3d Cir. 1995) that a letter to Human Resources complaining about unfair treatment in general, without specifically alluding to age discrimination, did not constitute the requisite "protected activity." See id. at 701-702. However, the Third Circuit in Barber based its decision on the fact that plaintiff's letter did not "explicitly *or implicitly* allege that age was the reason for the alleged unfairness." Id. at 702 (emphasis added); see also James v. Newsweek, Inc., 2000 U.S. App. LEXIS 8805, at *3 (2d Cir. 2000) (finding that plaintiff had neither directly *nor indirectly* complained about unfair treatment due to alleged discrimination).

Here, although Amodio may not have literally said to Reed that Pace was sexually harassing other employees, she has presented evidence that brings her complaints into context and supports the reasonable inference that Pace's sexual conduct was the reason for her complaints. In her conversations with Reed regarding Pace, she informed him that other employees might come to him to talk about Pace's inappropriate conduct, and at least one other employee eventually did complain. See Plf.'s Response at Ex. 6, Ringelheim Aff. ¶ 60. Moreover, in May 2002, Reed brought

10

in Lindsay Perry, Regional Human Resources Manager, to investigate Pace's conduct, and Wild Oats ultimately terminated Pace in January 2003, after he was charged with sexual harassment.  See id. at Ex. 6, Ringelheim Aff. ¶ 60.  With respect to "protected activity," therefore, the court finds that Amodio satisfies the first prong of the *prima facie* test for retaliation.[7]

### 2.   Adverse Action

There is no dispute that plaintiff's termination in October 2003 is considered an "adverse employment action" as the term is understood under Title VII.  See Galabya v. New York City Bd. of Educ., 202 F. 3d 636, 640 (2d Cir. 2000).  Moreover, although Wild Oats questioned in its Memorandum in Support of its Motion for Summary Judgment whether Amodio's transfer from her marketing position to Natural Living in September 2002 should be considered an "adverse action," see Def.'s Mem. in Supp. at 15 n.8, at oral argument Wild Oats conceded that this argument is relatively weak in light of the Supreme Court's ruling in Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006).  Prior to this case, the Second Circuit generally looked to "whether the plaintiff has suffered 'a materially adverse change in h[is] employment status' or in the terms and conditions of his employment."  Kessler v. Westchester County Dep't of Social Servs., 2006 U.S. App. LEXIS 21530, at *20 (2d Cir. 2006) (quoting Williams v. R.H. Donnelley, Corp., 368 F. 3d 123, 128 (2d Cir. 2004)).

---

[7]The court agrees with Wild Oats that Amodio's complaint to Reed about Pace swearing in front of a person from the food bank is not "protected activity," as the "plaintiff's activities were directed at the behavior of co-employees toward third parties and were unrelated to an employment practice made illegal by Title VII."  McMenemy v. City of Rochester, 241 F.3d 279, 283 (2d Cir. 2001).

However, the Supreme Court's recent decision held that Title VII's anti-retaliation

provision "does not confine the actions and harms it forbids to those that are related to

employment or occur at the workplace. . . . [It] covers those [and only those] employer

actions that would have been materially adverse to a reasonable employee or job

applicant."  White, 126 S. Ct. at 2409.  The plaintiff in the White case had been

removed from forklift operations and reassigned to perform only track laborer tasks

after complaining about sexual harassment by her male supervisor.  See id.  The Court

warned that "reassignment of job duties is not automatically actionable," id. at 2417;

instead, it depends on the circumstances of each case, and "should be judged from the

perspective of a reasonable person in the plaintiff's position, considering 'all the

circumstances.'" Id. (citations omitted).  The Supreme Court concluded that, since

plaintiff's duties were dirtier, more arduous, and less prestigious, a jury could

reasonably consider such a reassignment to be materially adverse to a reasonable

employee, such that it could dissuade that employee "'from making or supporting a

charge of discrimination.'" Id. at 2415, 2417 (citations omitted).

Applying the White standard to the case at bar, Amodio has presented sufficient

evidence to create a genuine issue of material fact as to whether her transfer from the

marketing position to Natural Living Clerk was materially adverse to a reasonable

employee in her position.  Wild Oats argues that this move was not an adverse action,

although it agreed at oral argument that plaintiff's hours were cut back from 40 hours

per week to between 34 and 38 hours per week, and that she was no longer able to

participate in profit sharing at a manager's level.  See Plf.'s Stat. at Ex. 7, Amodio Aff. ¶

8.  Amodio also has come forth with evidence that this transfer was viewed by at least

12

one other employee as a "demotion," <u>see</u> Plf.'s Response at Ex. 6, Ringelheim Aff ¶ 51,

and that it led to a change in job responsibilities that were more physical in nature, as

she was required to do "constant lifting of very heavy crates in the back loading dock,

and less and less time [was] spent on the selling floor." <u>See</u> <u>id.</u> at Ex. 2, Amodio Dep.

at 185.  Such a change in duties was important in <u>White</u>, where the Supreme Court

noted that plaintiff's reassignment involved the "more arduous and dirtier" track labor

duties and that plaintiff's former position was objectively viewed to be a better job by her

co-workers.  <u>White</u>, 126 S. Ct. at 2417.  Thus, this evidence combined suffices to

present a genuine issue of material fact as to whether Amodio's transfer could have

discouraged a reasonable employee from complaining of unlawful discrimination and

harassment such that it would constitute a materially adverse employment action.

### 3.    Employer Awareness/Causal Connection

A *prima facie* case of retaliation under Title VII also requires the employer to be

aware of the protected activity.  <u>Galdieri-Ambrosini</u>, 136 F.3d at 292.  "'Implicit in [this]

requirement is the requirement that [the employer] understood, or could reasonably

have understood, that the plaintiff's opposition was directed at conduct prohibited by

Title VII.'"  <u>Pinner v. Budget Mortg. Bankers, Ltd.</u>, 169 Fed. Appx. 599, 600, 2006 U.S.

App. LEXIS 2536, at *3 (2d Cir. 2006) (quoting <u>Galdieri-Ambrosini</u>, 136 F.3d at 292).

Without awareness by a decision-maker, it will be hard to find any causal connection

between the protected activity and the adverse action.  <u>See</u> <u>Galdieri-Ambrosini</u>, 136

F.3d at 292.

Both parties agree that Reed and Pace did not work at Wild Oats when Amodio

was terminated.  They left Wild Oats approximately one year and ten months,

respectively, before Amodio.  Moreover, Amodio has produced no evidence that any

other employee responsible for her transfer or termination, administrator or otherwise,

did it based on her complaints.  At oral argument, both parties acknowledged that Jim

Batema was the manager responsible for transferring Amodio and ultimately

terminating her.  There is not a sufficient basis upon which a reasonable jury could

conclude that Batema was aware of Amodio's complaints at the time he made these

decisions.  Amodio made her informal complaints to Scott Reed in December 2001 and

January 2002, and Batema did not begin working at Wild Oats until May 14, 2002.

Lindsey Perry's investigation into Paul Pace's alleged sexual harassment began before

Batema came to the store, and even if it were still ongoing when he arrived, there is no

basis to infer that Batema knew that Amodio had played any role in Perry's investigation

(i.e., that Amodio was the source of the complaints).

      This lack of awareness makes it difficult for Amodio to show that the transfer

and/or termination were causally connected to her informal complaints.  "Proof of

causal connection can be established indirectly by showing that the protected activity

was followed closely by discriminatory treatment . . . or through other evidence such as

disparate treatment of fellow employees who engaged in similar conduct . . . or directly

through evidence of retaliatory animus directed against a plaintiff by the defendant."

DeCintio v. Westchester County Medical Center,  821 F.2d 111, 115 (2d Cir.1987).  The

Second Circuit has not established a bright line rule for determining whether retaliatory

conduct "followed closely" a plaintiff's protected activity.  See Gorman-Bakos v. Cornell

Cooperative Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001).  It

has concluded that two years is too long a time to support an inference of a causal connection.  Richardson v. New York State Dept. of Correctional Service, 180 F.3d 426, 447 (2d Cir. 1999).  The Second Circuit, as well as district courts within the Second Circuit, have rejected finding a causal inference when there were gaps of three months, six months, eight months, one year, and eleven months between the filing of the complaint and the alleged retaliation.  White v. Whitman, 99-CIV-4777, 2002 WL 776589, at *12 (S.D.N.Y. April 26, 2002)(citing cases).  However, a court may overlook a longer gap in time between protected conduct and an adverse employment action where "the pattern of retaliatory conduct begins soon after the filing of the [ ] complaint and only culminates later in actual discharge."  Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996) (Fair Labor Act retaliation claim) (citing Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 377 n. 4 (6th Cir.1984) (Title VII case)).

        In light of the lack of any evidence of awareness on the part of Jim Batema, the court need not discuss whether Amodio's complaints in late 2001 and early 2002 are too attenuated temporally from her transfer and termination to support an inference of causation.  If Amodio was told of the transfer in late May 2002, see Plf.'s Response at Ex. 2, Amodio Dep. at 132, the relevant time frame would be no more than four months, which has been found to be too long a time in some cases.  See e.g., Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990) (failing to find a causal connection where the time between the protected activity and the adverse employment action was three months); Holt v. KMI-Continental, Inc., 95 F.3d 123, 130 (2d Cir. 1996) (finding no evidence of a causal connection where the protected action took place between one and three months before plaintiff was discharged).  However, the court need not decide

15

the temporal proximity question, because Amodio's retaliation claim must fail for lack of

evidence that would suggest that Batema was aware of her complaints and that there

was thus a sufficient causal connection for a reasonable jury to find in her favor.

**B.    Age Discrimination (Count II)**

  **1.    McDonnell Douglas Framework**

Amodio's federal age discrimination claim is analyzed under the burden-shifting

analysis first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

(1973).[8] Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000) (applying McDonnell

Douglas in ADEA context); see also Reeves v. Sanderson Plumbing Prods., Inc., 530

U.S. 133, 146-149 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-511

(1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-256 (1981).  The

initial burden lies on the plaintiff.  To establish a *prima facie* case, the plaintiff must

show:  (1) that she was within a protected class, (2) that she was qualified for the

position she held, (3) that she suffered an adverse employment action, and (4) that

such action occurred under circumstances giving rise to an inference of discrimination

based on a protected ground (here, age).  See McDonnell Douglas, 411 U.S. at 802.

Once a plaintiff has established a *prima facie* case, a rebuttable presumption of

discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-

discriminatory reason for its actions.  See Burdine, 450 U.S. at 254.  Upon the

_____

[8] The Second Circuit continues to apply the McDonald Douglas-Burdine-Hicks burden-shifting analysis to Title VII claims at the summary judgment stage, see, e.g., Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); Feingold v. New York, 366 F.3d 138 (2d Cir. 2004), even though some other courts have declined to apply it following the Supreme Court's decision in Desert Palace, Inc. v. Koster, 539 U.S. 90 (2003).  E.g., Dare v. Wal-Mart Stores, Inc., 267 F.Supp.2d 987(D.Minn.2003).

articulation of such a non-discriminatory reason, the presumption of discrimination that arose with the establishment of the *prima facie* case drops out, see St. Mary's Honor Ctr., 509 U.S. at 510-11, and the burden shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against her in the employment action.  Reeves, 530 U.S. at 143.  In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. Id.  A *prima facie* case combined with a showing that an employer's asserted justification is false is sometimes, but not always, sufficient to permit a discrimination claim to survive summary judgment.  Schnabel, 232 F.3d at 89-91 (citing Reeves, 530 U.S.).  The court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Id., 232 F.3d at 90 (quoting Reeves, 530 U.S. at 143).

Although neither party has specifically presented this case as a "mixed motive" case, the court notes that Amodio need not show that age was the *only* factor motivating any adverse employment actions she suffered in order to make a showing of employment discrimination.   See 42 U.S.C. §2000e-2(m); Desert Palace, Inc. v. Koster, 539 U.S. 90 (2003).  "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason," regardless of whether the case is presented as one of single or

17

dual motive.  Stratton v. Dep't for the Aging for New York, 132 F.3d 869, 878 (2d Cir.

1997).

### 2.   Ultimate Issue

In connection with the motion, Wild Oats does not dispute that Amodio has

established her *prima facie* case and Amodio does not contest that Wild Oats has come

forward with legitimate business reasons for the termination and transfer.  Indeed, both

parties agree that Jim Batema told Amodio that she should be moved to Natural Living

because "they were tanking out there, their sales were flat, and . . . there was nobody

there that had any real product knowledge, and sales background."  See Plf.'s

Response at Ex. 2, Amodio Dep. at 132.  They also agree that Amodio was ultimately

terminated pursuant to an age-neutral policy after not returning to work following the

expiration of her medical leave.  See Def.'s Stat. at Ex. B.  Thus, the only issue for the

court to decide is the ultimate issue as to whether Amodio has proffered evidence that

could support a jury finding that Wild Oats was motivated by age discrimination in

making the decisions to transfer and terminate her.

Amodio's evidence includes the following:  (1) Amodio's marketing job was

reassigned to employees in their twenties who had less experience than she did but

were paid more; (2) Amodio was threatened with being written up if she did not finish

her assignments while the younger Natural Living employees were given "happy faces"

on their assignment notes; (3) Amodio and two other older employees were treated

differently than other workers, including that they were the only hourly workers; (4) there

were numerous age-related comments, including an invitation to an assisted living

facility for seniors given to her by her supervisor; (5) Amodio complained to Reed and Batema about the age-related comments, but nothing came of this complaint; and (6) Amodio alleges that the younger employees in marketing were paid more than she was and were given driving vouchers.  The court finds that the sum of the evidence to which Amodio draws the court's attention is insufficient to persuade a reasonable jury that Wild Oats' proffered reasons for transferring and terminating her were a pretext for unlawful age discrimination.[9]

Amodio asserts that those who replaced her in the marketing position were all much younger and less experienced and were paid more than she was, see Plf.'s Response at Ex. 2, Amodio Dep. at 205-06, thus inferring that Wild Oats' reasons for her transfer were a pretext for unlawful age discrimination.  Wild Oats has presented testimony from Penelope DeMattio and Tracy Contino, both of whom assumed the marketing position following Amodio's transfer, stating that they were not paid more. See Def.'s Mem. in Supp. at Ex. B-C.  DeMattio asserts that she did not receive a raise in connection with the marketing position, see id. at Ex. C, DeMattio Aff. ¶ 5, and Tracy Contino was apparently paid the same rate of $15.00 per hour as Amodio was, see id. at Ex. B, Meszaros Aff. ¶ 3-4.  Wild Oats further argues that Amodio has not presented

---

[9]The fact that Wild Oats hired Amodio at the age of 53 does not require a grant of summary judgment to Wild Oats.  "When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'"  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 138 (2d Cir. 2000) (quoting Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)).  However, Amodio was hired by an individual different from the person who transferred her and terminated her employment.  Therefore, the fact that Amodio began working for Wild Oats at age 53 does not compel an inference that her transfer and/or termination was not motivated by age discrimination.

any evidence that her replacements were less qualified or less experienced than she was.  See Def.'s Reply Mem. at 9 [Doc. No. 25].  However, Wild Oats has also not presented any evidence that the replacements were in fact equally qualified or experienced, thus creating a question of fact on this issue.[10]

Amodio argues that the younger employees received "happy faces" on their work assignments while she did not is not indicative age discrimination.  Amodio asserts that she and Irwin Ringelheim, a former Demonstration Manager who claims he was discriminated against because of age, were the only two older managers who were paid hourly, see Plf.'s Response at Ex. 6, Ringelheim Aff. ¶ 9,[11] although Wild Oats counters that the reason Amodio was not paid on salary while in marketing was that the company was changing the position to an hourly one.  See Def.'s Reply Mem. at 10.  Amodio asserts further that only she and one other older employee were required to do the heavy lifting while in the Natural Living position, while the younger employees were not required to do such work.  See  Plf.'s Response at Ex. 2, Amodio Dep. at 159, 195.

---

[10]The court notes, however, that some of Amodio's statements may not be admissible at trial, e.g., regarding the higher salaries of the younger employees, because they could be hearsay without any applicable exceptions.  However, Wild Oats did not move to strike any of this evidence, so the court will consider it.

[11]Wild Oats points out that Ringelheim's affidavit should be excluded as the type of "me too" evidence that courts have found to be irrelevant and prejudicial.  See Def.'s Reply Mem. at 9 n.15.  Generally, the inquiry under Title VII/ADEA is whether similarly-situated persons outside the protected class were treated favorably in comparison to Plaintiff.  Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir. 1981).  Some courts have also held that having other individuals recount "the isolated actions taken against them individually would be of limited probative value to show the existence of a pattern or practice," especially where this evidence was "not calculated to demonstrate a pattern or practice of discrimination" and it thus would be "irrelevant" to the plaintiff's individual claim.  Moorhouse v. Boeing Co., 501 F. Supp. 390, 394 (E.D.P.A. 1980).  But see Buchholz v. Symons Manufacturing Company, 445 F. Supp. 706 (E.D. Wis.1978) (court considered the circumstances of other employees in determining whether defendants discriminated against plaintiffs on the basis of age).

However, Wild Oats relies on Kristin Coppolla's testimony at the CHRO fact-finding that stated that her job duties also included heavy lifting.  See Def.'s Reply Mem. at Ex. A-1, Strange Aff., ¶ 8; Ex. A-6, CHRO p.51.  Thus, these are issues of fact concerning Amodio's claim of unlawful age discrimination.  However, even if this evidence was sufficient to support a jury finding of discrimination, which the court assumes for purposes of this decision, Amodio does not link any of this disparate treatment to the person who was the decision-maker, Jim Batema, in connection with both her transfer and termination.  While Kristin Coppolla was Amodio's direct manager in the Natural Living department, id., there is no evidence in the record that she was involved in either decision.

Amodio has also presented evidence of alleged age-related comments.  For example, she claims that Scott Reed told her that, if she wanted to work at defendant's store in Maine, he could "find an old guy for me up there."  See Plf.'s Response at Ex. 2, Amodio Dep. at 274.  A manager apparently also questioned her about being "that old" in response to her having seen the Beatles when they were first on the Ed Sullivan Show.  See id. at Ex. 2, Amodio Dep. at 157, 279.  Additionally, Amodio claims that younger employees were asked why they wanted to socialize with someone old enough to be their mother, see id. at 148-49, and she also asserts that sometime between September and December 2002, two younger employees, Coppolla and Bridget Sullivan, showed Amodio an invitation to an assistant living facility reception for seniors, "laughing hysterically" about it in her presence, see id. at Ex. 2, Amodio Dep. at 209-10. At the time of this alleged incident, Coppolla was plaintiff's supervisor.

Such age-based remarks, however, are only sufficient to show that Wild Oats'
reasons are pretextual if Amodio can "demonstrate that a 'nexus' exists between the
statements alleged to be discriminatory and the defendant's decision to demote and/or
terminate the plaintiff." Young v. Pitney Bowes, Inc., 2006 U.S. Dist. LEXIS 20788, at
*59 (D. Conn. 2006). Indeed, courts have generally held "that stray remarks," without
more, "even if made by a decisionmaker, do not constitute sufficient evidence to make
out a case of employment discrimination." Danzer v. Norden Sys., 151 F.3d 50, 56 (2d
Cir. 1998) (citing Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994)). As the
decision in Young elaborated, to determine if comments are evidence of unlawful
discrimination or merely stray remarks, the following factors are considered: "(1) who
made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when
the remark was made in relation to the employment decision at issue; (3) the content of
the remark, i.e., whether a reasonable juror could view the remark as discriminatory;
and (4) the context in which the remark was made, i.e., whether it was related to the
decisionmaking process." Young, at *59-60 (citations omitted). The Second Circuit has
also emphasized that, even if one stray remark is by itself insufficient proof, it may
"'bear a more ominous significance' when considered within the totality of all the
evidence." Carlton, 202 F.3d at 136 (citations omitted).

In sum, considering together all the evidence before the court, the court finds
that, although Amodio's allegations of disparate treatment and age-related comments
create issues of fact that could support a finding of age discrimination, Amodio has
presented no evidence that the disparate treatment and age-related remarks are in any

22

way connected to the decision-maker, Jim Batema.  Indeed, the remarks, while more than "stray," do not appear to be sufficiently causally-related to Amodio's termination or transfer.  Although Amodio is not very clear on dates, she has provided no evidence that during the period of her leave she was subjected to any age discrimination. Moreover, there is no evidence that Jim Batema, the only individual responsible for terminating Amodio, made any age-related remarks, was involved in assigning her to do the heavy lifting, or was at all motivated in his decision by age discrimination.  Thus, Amodio has not shown that Wild Oats' age-neutral reason for terminating her because of failing to return to work after her leave expired was a pretext for unlawful discrimination.  As for the relationship between the age-related comments and her transfer, Amodio still has not presented sufficient evidence of a connection between the transfer and the alleged age discrimination.  Amodio has asserted that some of those who made age-related remarks were other managers; however, she has not presented evidence that these individuals were (also) involved in the decision to transfer her. Indeed, at oral argument both parties agreed that this decision was made by Jim Batema in late May, soon after he had begun to work at Wild Oats on May 14, 2002, see Def.'s Stat. at Ex. C [Doc. No. 19]; Plf.'s Response at Ex. 2, Amodio Dep. at 133.

Even, as the court must on summary judgment, it were to credit Amodio's assertion that she complained to both Scott Reed and Jim Batema regarding the age-related comments, there is still insufficient causal connection to permit a finding that Amodio's transfer or termination was motivated by age discrimination.  Amodio apparently complained to Reed about the age-related remarks at some point before he left Wild Oats, although it is unclear exactly when she did so.  See Def.'s Mem. in Supp.

23

at 18 n.9 & Ex. A-2, Amodio Dep. at 270-72.  Additionally, Amodio alleges Jim Batema

told her that Lindsay Perry in Human Resources would be investigating the "old lady"

comments, although she was never informed of any resolution of this investigation.

See Plf.'s Response at 34 & Ex. 2, Amodio Dep. at 283.  Amodio provides no date as to

when Batema told her about this investigation, and thus the court cannot infer from the

fact that she was not told of any resolution that Batema made any decision based on

her age.  Amodio has not provided any evidence suggesting Batema approved,

adopted, or condoned the age-related comments or was in any way influenced by age

animus.

Thus, for the reasons discussed above, Amodio's *prima facie* case and evidence

of pretext are fairly weak, and Wild Oats presented evidence that Amodio's transfer and

termination resulted from age-neutral reasons.  The court holds that Amodio has not

proffered sufficient evidence to permit a finding that her transfer or termination was

motivated by age discrimination.  Therefore, the court grants Wild Oats' motion for

summary judgment on this Count.

### C.    Disability Discrimination (Count IV)

The American with Disabilities Act of 1990 ("ADA") prohibits discrimination

against a "qualified individual with a disability because of the disability" in the "terms,

conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In order for Amodio

to establish that Wild Oats discriminated against her because of a disability, she must

show that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is

regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was

qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [her] disability or perceived disability."  Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005).  Neither party challenges that Wild Oats is covered by the ADA.

Amodio asserts that Wild Oats had initially accommodated her disability arising from her impingement injury by placing her in the marketing position, and then withdrew that accommodation when it transferred her to Natural Living.  Her evidence for establishing that the marketing position was meant to be an accommodation for her disability was based on responses to her comments regarding her injury to Dave Bernier and Scott Reed upon hiring and to Jim Batema upon transfer regarding her injury.  She asserts that, upon telling these managers of her injury, they assured her that "there are lots of interesting things here" for her to do besides the more physically-intense grocery and stocking positions, and that they "weren't going to waste a good salesperson in that way."  See Plf.'s Response at Ex. 2, Amodio Dep. at 72, 92.  She claims that, when the Natural Living Clerk position ultimately began to involve more physical work than she had previously done, Wild Oats withdrew the accommodation without a legitimate business reason for doing so.  Because the court need not reach the "reasonable accommodation" inquiry unless Amodio were "disabled" under the ADA, the court will first analyze whether Amodio has established that she suffers from a disability within the meaning of the ADA.

The ADA defines "disability" as:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42

U.S.C. § 12102(2).  Whether a disability exists must be determined on a "case-by-case" basis.  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002).  Not every impairment is a "disability" under subsection (A) of the ADA's definition; instead, to qualify as disabled, a plaintiff must show both that her physical or mental impairment limits a "major life activity" and that this limitation is "substantial."  42 U.S.C. § 12102(2)(A).  The parties do not dispute that Amodio's neck, left shoulder, and wrist impingement injury amounts to a physical impairment.  However, Wild Oats argues that Amodio's condition does not satisfy the statute's definition of "disability," in that it does not substantially limit any major life activities.

The Supreme Court has restricted "major life activities" to those activities "that are of central importance to daily life."  Toyota, 534 U.S. at 197.  The HEW Rehabilitation Act regulations provide a non-exhaustive list of what constitutes "major life activities," which includes "walking, seeing, hearing, . . . [and] performing manual tasks."  Id. at 195 (quoting 45 C.F.R § 84.3(j)(2)(ii) (2001)).  Similarly, EEOC regulations interpreting the term define it as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[12]  29 C.F.R. § 1630.2(i) (2006).  The term "substantially limits" is not defined by the HEW regulations, but the EEOC has defined it to mean:

> "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average

---

[12]Although the Supreme Court declined to decide how much deference to give to the EEOC regulations, see Toyota at 194, the Second Circuit has referred to them in deciding what constitutes a "major life activity."  See Capobianco, F.3d at 56.

26

person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1).  To decide whether a major life activity is substantially limited, the following factors are considered: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."

29 C.F.R. § 1630.2(j)(2).  That the impairment "requires an individual to perform a task differently from the average person does not mean that she is disabled" under the ADA.  Capobianco, F.3d at 57.  Moreover, the question is not whether the particular impairment affects an individual's ability to perform tasks associated with a specific job; instead, the focus must be on whether that person "is unable to perform the variety of tasks central to most people's daily lives."  Toyota, 534 U.S. at 200.  Finally, whether an impairment is a "disability" under the ADA is to be determined by taking into account any corrective or mitigating measures.   Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999).

In this case, Amodio argues that her impingement injury renders her "disabled" within the meaning of the ADA.[13]  The major life activities most relevant to Amodio's neck, left shoulder, and wrist impingement injury are performing manual tasks, working, and lifting.  The Supreme Court has held that, for performance of manual tasks to be a major life activity, the critical question is "whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable

_____

[13]Wild Oats initially argued that plaintiff's eye surgery did not render her disabled under the ADA.  However, Amodio's response asserted that Wild Oats "mistakes what the relevant inquiry is regarding Plaintiff's disability claim," and that instead the focus should be on Amodio's neck, left shoulder, and wrist impingement injury.  See Plf.'s Response at 16-17.  Thus, the court will only address whether Amodio's impingement injury can be the basis for a disability claim under the ADA, in light of Amodio's failure to press any concerning her eye surgery.

27

to perform the tasks associated with her specific job." Toyota, 534 U.S. at 200.  Thus,

substantial limitations on "occupation-specific tasks may have only limited relevance,"

as the central question is whether substantial limitations are placed on an individual's

ability to do such manual tasks as "household chores, bathing, and brushing one's

teeth."  Id.  Although Amodio's injury may have resulted in periods of pain or affected

her ability to "do certain physical things on a regular basis, " Plf.'s Response at 17; id. at

Ex. 2, Amodio Dep. at 92, she has presented insufficient evidence that her

impingement injury *substantially* prevented her from taking care of herself, dressing,

running errands, doing chores, and performing manual tasks.  See Def.'s Reply Mem.

at Ex. A-2, Amodio Dep. at 32-35.

There remains the question of whether Amodio's impingement injury

substantially limited her major life activity of working.  Although the Supreme Court in

Toyota did not decide whether working was a major life activity, 534 U.S. at 193, the

Second Circuit has accepted that it is.  See Cameron v. Cmty. Aid for Retarded

Children, Inc., 335 F.3d 60, 64 (2d Cir. 2003); Colwell v. Suffolk County Police Dep't.,

158 F.3d 635, 642 (2d Cir. 1998).  In Sutton, 527 U.S. at 491, the Supreme Court did

discuss what should be the standard when the major life activity under consideration is

that of working.[14]  It held that, assuming working is a major life activity,

> "one must be precluded from more than one type of job, a specialized job, or a
> particular job of choice.  If jobs utilizing an individual's skills (but perhaps not his
> or her unique talents) are available, one is not precluded from a substantial class
> of jobs.  Similarly, if a host of different types of jobs are available, one is not

---

[14]The Supreme Court did not find it necessary to determine whether working is a major
life activity since both parties accepted that it was.  527 U.S. at 492.

precluded from a broad range of jobs."[15]

Id. at 492.

Applying this standard to the case at bar, Amodio has not produced sufficient evidence to create a material issue of fact that her impingement injury substantially limited her ability to work in a broad class or range of jobs.  Indeed, she admits that before the move to Natural Living, Amodio's injury did not prevent her from performing any of her job functions as a marketing manager or at home.  Plf.'s Response at Ex. 2, Amodio Dep. at 240-41.  Moreover, plaintiff requested to return as marketing manager in the same store after she had begun her medical leave period, thereby indicating that her injury was not a substantial limitation on her ability to work.  See id. at Ex. 2, Amodio Dep. at 142-43.  It seems that her impairment disqualified her "from only a narrow range of jobs" (those involving physical work) and thus her impairment is not "a substantially limiting one."  Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir. 1994).

The Second Circuit has also assumed that lifting is a major life activity.  See Colwell, 158 F.3d at 642 (see also Ryan v. Grae & Rybicki, 135 F.3d 867, 870 (2d Cir. 1998).  However, in Colwell, the court held that plaintiff's vague descriptions of his lifting limitations did not support his claim that his impairment would be significantly limiting to "the average person in the general population," especially since he seemed able to lift light objects of 10 to 20 pounds at infrequent intervals  Id. at 644 (quoting 29 C.F.R. § 1630.2(j)(1)); see also Piascyk v. City of New Haven, 64 F. Supp. 2d 19, 30 (D. Conn.

---

[15]The Supreme Court later clarified that this "class-based framework" does not apply when the major life activity is not that of working.  Toyota, 534 U.S. at 200.

1999) (holding that because plaintiff could lift up to 15 pounds, she could not be considered disabled within the meaning of the ADA).  Moreover, the analysis in Toyota seems to require a court to determine whether an individual's physical condition limits her ability to lift not simply items at work, but also interferes with the central functions of her daily life.  See Mack v. Great Dane Trailers, 308 F.3d 776, 781 (7th Cir. 2002) (applying Toyota to major life activity of lifting); Capobianco, 422 F.3d 47 (applying Toyota to major life activity of seeing); EEOC v. United Parcel Serv., Inc., 306 F.3d 794 (9th Cir. 2002) (same).

According to Amodio, she was hired with the understanding that she was unable to do certain physical tasks.  See Plf.'s Loc.R.Civ.P. 56(a)2 Stat. at Ex. 2 [Doc. No. 22].  She also claims that when she was transferred by Jim Batema, he confirmed that she would not be required to do much manual labor.  See Plf.'s Response at Ex. 2, Amodio Dep. at 71-72.  After being transferred, however, Amodio asserts that her job responsibilities became more physical, and thus she was required to leave work on January 30, 2003, due to neck pain.  She came back to work on February 1, 2003, with a doctor's note stating that she could do "no heavy lifting, bending or pushing for a week."  See Def.'s Stat. at Ex. A-3, Pl. Dep. Ex. 10.  However, the fact that she was unable to do *heavy* lifting does not provide sufficient evidence that she was substantially limited in her major life activity of lifting, for the Second Circuit has found such a limitation not to be substantially restrictive in relation to that of most people.  See Colwell, 158, F.3d at 644 (such impairment was not significantly limiting to "the average person in the general population").  Although a work-restriction alone may sometimes

30

support an inference of a broader limitation on a major life activity – "an inability to lift even a pencil on the job might suggest an inability to lift a toothbrush, for example, or to otherwise care for oneself," Mack, 308 F.3d at 781 – the restrictions in Amodio's case did not seem to amount to that level, as Amodio has asserted that despite her impingement injury, she was still generally able to care for herself, even if sometimes with pain, and do most errands and chores.  See Def.'s Reply Mem. at Ex. A-2, Amodio Dep. at 32-35.  Thus, Amodio has not provided sufficient evidence that her injury prevented her from performing the variety of lifting tasks "central to most people's daily lives."  Toyota, 534 U.S. at 200.

Amodio also claimed for the first time at oral argument that Wild Oats "regarded her" as disabled, based on the fact that when she was initially hired they discussed her impingement injury with her, accommodated her disability by placing her in the marketing position, and then withdrew that accommodation when transferring her to Natural Living.  The "regarded as" prong under the ADA requires a plaintiff to prove that she is "regarded as" having an impairment that substantially limits one or more major life activities.  42 U.S.C. § 12102(2)(C) (1994).  The Second Circuit has explained that whether an individual is "regarded as" having a disability "turns on the employer's perception of the employee" and is thus "a question of intent, not whether the employee has a disability."  Francis v. City of Meriden, 129 F.3d 281, 284 (2d Cir. 1997).  However, it is not enough that the employer regarded the plaintiff as "somehow disabled;" instead, "the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA."  Colwell, 158 F.3d at 646.  In this case, as discussed above, Amodio has presented no evidence that Wild Oats regarded her as

having an impairment that substantially limited a major life activity.

Since the court finds that the record is insufficient to support Amodio's claim that she is "disabled" under the ADA, the court need not address whether she has satisfied the remaining elements of her *prima facie* case.

### D.   Intentional Infliction of Emotional Distress (Count V)

In order to maintain her claim for intentional infliction of emotional distress under Connecticut law, Amodio must show that:  (1) Wild Oats intended to inflict emotional distress on her or knew, or should have known, that emotional distress was the likely result of its actions; (2) that Wild Oats' conduct was extreme and outrageous; (3) that Wild Oats' conduct is the cause of Amodio's emotional distress; and (4) that the emotional distress sustained is severe.  See Appleton v. Bd. of Educ. of the Town of Stonington, 254 Conn. 205, 210 (2000).  Whether Wild Oats' conduct was extreme and outrageous is the initial question for the court to address.  See id.  "Only where reasonable minds disagree does it become an issue for the jury."  Id.

To be extreme and outrageous, Wild Oats' conduct must exceed "all bounds usually tolerated by decent society . . . ."  See id. (quotation omitted).  In fact,

> [l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Id. (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d, 73 (1965)).  Wild Oats asserts that it did not engage in any extreme or outrageous conduct and that

32

reasonable minds cannot disagree in this situation.

Since Amodio conceded at oral argument that she was no longer pressing this claim, the court grants Wild Oats' motion for summary judgment on Amodio's claim for intentional infliction of emotional distress.

### E.     Retaliation - CONN. GEN. STAT. § 31-51q (Count III)

Since this court grants summary judgment to Wild Oats on all of its federal claims, it will decline to exercise supplemental jurisdiction over Amodio's state claim of retaliation under Conn. Gen. Stat. § 31-51q.  28 U.S.C. § 1367(c)(3).


## V.     CONCLUSION

For the foregoing reasons, Wild Oats' motion for summary judgment [**Doc. No. 17**] is GRANTED as to Counts I, II, IV, and V, and Count III is dismissed  The clerk is ordered to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 28th day of September, 2006.


/s/ Janet C. Hall                            
Janet C. Hall
United States District Judge

33